RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

VICTOR L. SMITH,

*Plaintiff-Appellant,*

*v.*

CITY OF TROY, OHIO; MIAMI COUNTY, OHIO; P.M.
OSTING; S.A. GATES; H. HOHENSTEIN; C.A. MADIGAN,

*Defendants-Appellees.*

No. 16-4719

---

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:15-cv-00054—Thomas M. Rose, District Judge.

Decided and Filed:  November 1, 2017

Before:  COLE, Chief Judge; DAUGHTREY and DONALD, Circuit Judges.

---

## COUNSEL

**ON BRIEF:**  Bryan K. Penick, Joseph E. Zeis, Jr., SEBALY, SHILLITO & DYER, Dayton, Ohio, for Appellant.  Edward J. Dowd, Kevin A. Lantz, SURDYK, DOWD & TURNER CO., L.P.A., Dayton, Ohio, for Appellees City of Troy, Gates, Hohenstein, and Madigan.  Daniel T. Downey, Paul M. Bernhart, FISHEL HASS KIM ALBRECHT DOWNEY LLP, Columbus, Ohio, for Appellees Miami County and Osting.

---

## OPINION

---

PER CURIAM.  Victor L. Smith, represented by counsel, appeals the district court's judgment granting summary judgment to the defendants on his claims under 42 U.S.C. § 1983 and Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12132.  The parties have

waived oral argument, and the panel unanimously agrees that oral argument is not needed. *See* Fed. R. App. P. 34(a).

Smith has epilepsy. On the morning of February 11, 2014, he began experiencing a seizure while driving in Troy, Ohio. Smith steered his car into a yard located at 449 Glendale Avenue, exited the car, and walked a few houses away. A neighbor called the police to report that Smith was involved in suspicious activity. Miami County Deputy Sheriff Phillip M. Osting was the first to arrive at the scene. Osting observed Smith grasping a waist-high chain-link fence, swaying back and forth. Smith's pants were down around his knees, revealing his white longjohns, and he was yelling out, "Baby." Osting identified himself and asked Smith to return to his car to discuss the incident. Smith did not respond and kept yelling, "Baby." Although it was cold, Osting noticed that Smith was sweating. Osting thought that Smith was under the influence of something by the way Smith was acting. Osting placed his hand on Smith's right hand, which was grasping the fence, and his other hand on Smith's back, and again asked Smith to return to his car. Osting felt Smith tense up, and so he began to peel Smith's fingers from the fence. Once Osting pried Smith's fingers from the fence, Smith pulled his arm away. Osting then took Smith to the ground with a leg sweep. Smith hit the ground facedown and Osting fell on top of him.

Osting had control of Smith's right arm and was struggling to gain control of Smith's left arm. After Osting wrestled with Smith for 30 seconds to a minute, Troy Police Officer Scott Gates arrived on the scene. Gates drew his taser and ordered Smith to put his hands behind his back. Smith looked at Gates blankly but did not comply. Gates put his taser in drive-stun mode and tried to grab Smith's left arm. Smith moved his arm underneath his body. Gates then applied the taser to Smith's upper-back and lower-neck area. By that time, Troy Police Officers Hans Hohenstein and Chris Madigan had arrived on the scene and grabbed Smith's legs, allowing Osting to gain control of Smith and handcuff him. The data recorder on Gates's taser later showed that he had deployed it eight times, for a total of 48 seconds, during an encounter with Smith that lasted less than two minutes. None of the officers ever informed Smith that he was under arrest.

Smith testified that he drifted in and out of lucidity during the incident. He remembered the onset of the seizure, leaving the road, honking his horn for help, and exiting the car. He remembered trying to support himself on the fence, encountering Deputy Osting, telling Osting he was sick and having a seizure, and being taken to the ground. Smith did not remember struggling with the officers or being tased. Smith thought that he came out of the seizure when he was on the ground but then had another seizure and did not wake up until he was in an ambulance on the way to the hospital. Smith claimed that he has post-traumatic stress disorder as a result of the incident.

Smith filed a complaint against the City of Troy; Miami County, Ohio; Deputy Osting; and Officers Gates, Hohenstein, and Madigan under § 1983 and under Title II of the ADA. Smith sued the individual law enforcement officers in their official and individual capacities, claiming that they violated his Fourth Amendment rights by using excessive force against him and by failing to intervene to protect him against the allegedly excessive force employed by the other officers. Smith claimed that the City of Troy and Miami County were responsible for their respective officers' allegedly unconstitutional conduct under theories of ratification, negligent hiring and retention, and failure to train. Smith also claimed that the City of Troy's and Miami County's alleged failure to train its law enforcement officers properly on confronting and attending to persons with disabilities denied him the benefit of law enforcement services, in violation of Title II of the ADA. Finally, Smith asserted state-law claims against the defendants for assault and battery and for intentional infliction of emotional distress.

The district court granted summary judgment to the defendants on Smith's federal civil rights claims. As to Smith's excessive-force claims, the district court concluded that the officers used measured force in response to Smith's defiance of their orders and reaching where the officers could not see his hands. The district court held, therefore, that the officers did not use excessive force as a matter of law. The district court concluded further that even if the individual officers did use excessive force, they were entitled to qualified immunity under the facts of the case. The district court held that the municipal defendants could not be liable under § 1983 without an underlying constitutional violation. The district court concluded further that Smith's § 1983 claims against the municipal defendants failed because he did not produce evidence of a

pattern of constitutional violations by their law enforcement officers. The district court granted the defendants summary judgment on Smith's ADA claim because the officers did not take action against Smith because of his disability. After granting the defendants summary judgment on Smith's federal claims, the district court declined to exercise supplemental jurisdiction over his state-law claims and dismissed them without prejudice. Smith's timely appeal followed.

We review de novo a district court's order granting summary judgment. *See Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court reviewing a summary judgment motion must draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## I. Individual Liability Under § 1983

The Fourth Amendment prohibits law enforcement officers from using excessive force when making an arrest. *See Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006). In order to comply with the Fourth Amendment, an officer's use of force must be objectively reasonable under the totality of the circumstances. *See Kent v. Oakland Cty.*, 810 F.3d 384, 390 (6th Cir. 2016). In evaluating whether a police officer used excessive force on a particular occasion, the court must view the situation from the perspective of a reasonable officer on the scene at the time and without the benefit of 20/20 hindsight. *See id.* To determine whether the officer's use of force was reasonable, the court must consider the severity of the crime at issue, whether the suspect posed a threat to the officers or others, and whether the suspect was actively resisting arrest or attempting to avoid arrest by fleeing. *See id.*

A public official is entitled to qualified immunity and, thus, is shielded from suit under § 1983 if his conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640

(1987). The official, however, is entitled to qualified immunity only for actions taken in objective good faith within the scope of his duties. *See Harlow*, 457 U.S. at 819 n.34.

Determining a public official's entitlement to qualified immunity involves a two-step inquiry. The court must determine whether the facts alleged, judged in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no constitutional right would have been violated on the facts alleged, the inquiry stops at this point and the officer is entitled to qualified immunity. *See id.* If a violation can be made out based on a favorable view of the pleadings, the court must determine whether the right at stake was clearly established. *See id.* In making this determination, the court must rely on decisions from the United States Supreme Court, the Sixth Circuit Court of Appeals, or finally, the decisions of other circuit courts. *See Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993). Courts have discretion to decide in which order to address the two parts of the qualified-immunity analysis. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Whether the right alleged to have been violated is clearly established and whether the official reasonably could have believed that his conduct was consistent with that right are questions of law for the court. *See Walton*, 995 F.2d at 1336. But if genuine issues of material fact exist as to whether the official committed acts that would violate a clearly established right, then dismissal of the claim is improper. *See id.* When a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *See Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009). In order to deny public officials qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately. *See Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009). Finally, the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way. *See id.*

A. Deputy Osting

Viewing the record in the light most favorable to Smith, we conclude that Deputy Osting violated Smith's right to be free from excessive force when he took Smith to the ground with a leg sweep and landed on top of Smith. There is little in the record to suggest that Smith committed any crime, even a minor one. There are factual disputes concerning whether Smith was involved in an automobile accident or whether he parked his car in the yard, and whether he left the scene of an accident or simply wandered away in a stupor due to his seizure. Smith claims that he told Osting that he was sick and having a seizure. In his incident report, Osting concedes that Smith was holding the fence to maintain his balance and that Smith told him that he was sick and needed to use the restroom. Osting did not state, either in his incident report or in his deposition testimony, that he believed that Smith presented a safety threat.

Moreover, Osting never told Smith that he was under arrest, and there is a factual dispute as to whether Smith actually resisted Osting before Osting took him to the ground, or whether Smith merely failed to comply with Osting's order to return to the car. It was well-established at the time of the incident in this case that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force. *See Kent*, 810 F.3d at 396 (stating that it was clearly established in 2005 that a police officer cannot use force against a detainee who has been subdued, is not told that he is under arrest, and is not resisting arrest). A reasonable juror could conclude that, in pulling his arm away, Smith's resistance was minimal and that Osting's response in taking Smith to the ground was excessive. *See Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (holding that "passive" resistance does not justify substantial use of force). Viewing the record in the light most favorable to Smith, a reasonable officer in Osting's position would have known that he would violate Smith's right to be free from excessive force by using a leg sweep to force him to the ground. Accordingly, for purposes of summary judgment, we conclude that Osting violated Smith's right to be free from excessive force by knocking him to the ground and then landing on top of him. Osting is not entitled to qualified immunity for this use of force.

Smith also has presented a genuine factual dispute regarding whether his failure to put one of his arms behind his back while lying face-down on the ground constitutes "resistance"

sufficient to justify forcible handcuffing by Osting. Significantly, at no point during the entire episode was Smith under arrest for any offense whatsoever. And, during his deposition testimony, Osting conceded that the mere failure of a citizen—not arrested for any crime—to follow the officer's commands does not give a law enforcement official authority to put the citizen in handcuffs. If Smith indeed had committed no crime, if he was unarmed, and if no evidence was adduced that he posed a threat to himself or to others, Osting's forcible handcuffing of him would be excessive and in violation of well-established constitutional principles. Osting thus also was not entitled to qualified immunity for his actions in this regard, especially given the fact that there is no evidence that Osting took Smith to the ground for any reason other than to handcuff him and restrain him forcibly.

Smith also claims that Osting failed to intervene to protect him from Officer Gates's allegedly excessive deployment of the taser to subdue him. In order to establish a claim against a police officer for failing to intervene or for failing to protect him from another officer's use of excessive force, the plaintiff must prove that the officer observed or had reason to know that excessive force would be or was being used and that the officer had both the opportunity and the means to prevent the harm from occurring. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). In this case, Osting was occupied trying to gain control of Smith's arms while Gates was deploying the taser. Consequently, no reasonable juror could find that Osting had the opportunity and the means to prevent Gates from tasing Smith excessively.

## B. Officer Gates

Osting had already taken Smith down and was struggling to gain full control of him before Gates arrived on the scene. Gates therefore could not have prevented Osting's initial use of force against Smith. Gates was justified in tasing Smith because Gates was unaware of what had transpired before his arrival on the scene and because Smith appeared to be resisting being handcuffed. *See Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). Smith, however, has presented evidence that Gates tased him for 48 seconds in less than two minutes and that, under the circumstances, Smith did not have sufficient time to comply with the officers' commands to submit to handcuffing. It was clearly established at the time of the incident in this case that a police officer violates a suspect's right to be free from excessive force

by repeatedly tasing the suspect without giving him a chance to comply with orders. *See Kent*, 810 F.3d at 392 (holding that a police officer uses excessive force where the suspect could not have actively resisted police in between a rapid series of taser applications). Consequently, viewing the record in the light most favorable to Smith, we conclude that Gates's repeated deployment of the taser on Smith was unreasonable and that Gates is not entitled to qualified immunity on this aspect of Smith's excessive-force claim.

## C. Officers Hohenstein and Madigan

The record does not support an inference that Officers Hohenstein and Madigan violated Smith's right to be free from excessive force or that they failed to protect him from the other officers' allegedly excessive use of force. Like Gates, Hohenstein and Madigan arrived after Osting took Smith to the ground; therefore, they could not have prevented this use of force. Hohenstein and Madigan were trying to control Smith's legs while Gates was deploying his taser. The record thus does not support a conclusion that they had a realistic opportunity to prevent Gates's unreasonable deployment of his taser. Accordingly, we conclude that the district court correctly granted summary judgment to Hohenstein and Madigan on Smith's excessive-force claim.

## II. Municipal Liability Under § 1983

Smith claims that the City of Troy and Miami County are liable under § 1983 for their respective officers' unconstitutional conduct under theories of ratification, negligent hiring and retention, and failure to train. However, a municipality cannot be held liable under § 1983 simply because one of its employees violated the plaintiff's constitutional rights. *See Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). In other words, § 1983 does not impose *respondeat superior* liability on municipalities. *See id.* In order to impose § 1983 liability on a municipality, the plaintiff must prove that the constitutional deprivation occurred as a result of an official custom or policy of the municipality. *See id.*

Smith cannot establish municipal liability under a failure-to-train theory because he has not shown that the municipal defendants "ignored a history of abuse and [were] clearly on notice

that [their] training [in the deployment of tasers and the proper use of force] was deficient and likely to cause injury." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted). Smith has not shown that the municipal defendants have demonstrated a pattern of inadequately investigating excessive force claims and, therefore, that they have a custom of tolerating the use of excessive-force by their officers. *See id.* Similarly, Smith has not shown that the municipal defendants' allegedly inadequate investigation into his case, or their alleged *post hoc* ratification of the officers' conduct, was itself a source of injury to him. *See id.* at 478-89. It appears that on appeal Smith has abandoned any claim that the municipal defendants negligently hired and retained the individual defendants by not advancing an argument in support of it in his merits brief. *See United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006). In any event, Smith has not shown that the plainly obvious consequence of hiring and retaining these officers would be the deprivation of a third party's federally protected rights. *See Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 411 (1997).

Accordingly, we conclude that the district court properly granted summary judgment to the municipal defendants on Smith's § 1983 claims.

### III.  Americans With Disabilities Act

Smith also claims that the defendants denied him access to police services because of his disability, in violation of Title II of the ADA. In order to establish a Title II violation, the plaintiff must show that the defendants intentionally discriminated against him *because of* his disability. *See Thompson v. Williamson Cty.*, 219 F.3d 555, 558 (6th Cir. 2000). In this case, even granting that the officers used excessive force against Smith, he has not shown that they intentionally discriminated against him because of his disability. Accordingly, we find that the district court correctly granted summary judgment to the defendants on Smith's ADA claim.

### IV.  Pendent State-Law Claims

Because the district court dismissed all of Smith's federal claims, it declined to exercise supplemental jurisdiction over Smith's state-law causes of action. In light of our reinstatement of a number of federal claims raised in Smith's complaint, it is possible that the district court now may wish to examine the state-law claims arising from the same operative facts.

The district court should have the opportunity on remand to determine anew whether to exercise its discretion under 28 U.S.C. § 1367(a).

Conclusion

For the reasons discussed, we **REVERSE** the district court's judgment granting summary judgment to Deputy Osting on Smith's claims that Osting used excessive force in taking him to the ground with a leg sweep and in handcuffing him forcibly; **REVERSE** the district court's judgment granting summary judgment to Officer Gates on Smith's claim that Gates excessively deployed his taser; and **REVERSE** that part of the district court's judgment dismissing Smith's pendent state-law claims. We **AFFIRM** the remainder of the district court's judgment and **REMAND** this case to the district court for further proceedings consistent with this opinion.